KOPPERS COMPANY, INC., Plaintiff,

v.

AMERICAN EXPRESS COMPANY, a corporation, Shearson Lehman Brothers Holdings, Inc., a corporation, Shearson Lehman Hutton, Inc., a corporation, SL–Merger, Inc., a corporation, BNS Partners, a partnership, BNS Inc., a corporation, Bright Aggregates Inc., a corporation, Beazer PLC, a public limited company, and National Westminster Bank PLC, an English banking company, Defendants.

Civ. A. No. 88–557.

United States District Court,
W.D. Pennsylvania.

May 13, 1988.

Joseph A. Katarincic, David Borkovic, Kirkpatrick & Lockhart, Edward B. Wood,

Koppers Co., Law Dept., Pittsburgh, Pa., for plaintiff Koppers Co., Inc.

William M. Wycoff, Ralph Scalera, Craig Frischmann, Thorp, Reed & Armstrong, Pittsburgh, Pa., Edwin B. Mishkin, Cleary, Gottlieb, Steen & Hamilton, New York City, for defendants BNS Partners, BNS Inc., Bright Aggregates, Inc., and Beazer PLC.

James D. Morton, Stanley Yorsz, Buchanan Ingersoll P.C., Pittsburgh, Pa., Stephen Greiner, Willkie, Farr & Gallagher, New York City, for defendants American Exp. Co., Shearson Lehman Brothers Holdings, Inc., Shearson Lehman Hutton, Inc., and SL–Merger, Inc.

Theodore O. Struk, Dickie, McCamey & Chilcote, P.C., Pittsburgh, Pa., for defendant Nat. Westminster Bank PLC.

### ORDER

COHILL, Chief Judge.

AND NOW, to-wit, this 13th day of May, 1988, the Court having made certain inquiries of the Securities and Exchange Commission, and the Court having received a response thereto in the form of the letter attached hereto as Appendix A, It Is Hereby ORDERED, ADJUDGED, and DECREED that this response be and hereby is made a part of the public record. It appears that no further evidentiary hearing or discovery will be necessary with respect to preventive measures adopted by Shearson Lehman Brothers Holdings, Inc. and its related entities to avert potential conflicts of interest.

### APPENDIX A.

UNITED STATES

### SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C., 20549

May 12, 1988

Hon. Maurice B. Cohill, Jr.

Chief Judge

United States District Court

Western District of Pennsylvania

Pittsburgh, Pennsylvania 15219

Re: *Koppers Co., Inc. v. American Express Co.*, No. 88–0557 (W.D. Pa.)

Dear Judge Cohill:

The Commission has authorized me to respond on its behalf to your letter of April 22, 1988. In that letter, you asked for the Commission's views on a federal securities law question arising from the BNS, Inc. tender offer for the shares of Koppers Co., Inc. Your letter refers to an opinion and order in the above-captioned matter dated April 15, 1988, in which Your Honor preliminarily enjoined the tender offer, finding a high probability that Koppers will be successful in establishing at a trial on the merits that Shearson Lehman Brothers Holdings, Inc. ("Shearson") is a bidder for purposes of the Williams Act and therefore violated the filing requirements of the Williams Act. As your letter (p. 2) states, that decision was

> based on the facts that: (1) Shearson Holdings holds a significant [*i.e.*, 46 percent] equity interest in the shell corporation, BNS, Inc., through SL–Merger [a wholly-owned Shearson subsidiary]; (2) it will acquire additional significant interests in BNS, Inc. if the tender offer should succeed as a result of its direct contribution to the financing of the purchase; and (3) that Shearson Holdings stands to earn substantial fees as a broker-dealer and underwriter of various financial offerings and transactions associated with the tender offer.

In view of that holding as to Shearson's co-bidder status under the Williams Act, your letter (p. 4) asks:

> Whether Shearson Holdings' multi-faceted role in the takeover attempt and its simultaneous equity position in BNS, Inc. (as these roles are explained in the tender offer) violate any federal securities laws because of the apparent, inherent conflicts of interest which these roles present. In other words, can the Chinese Wall concept, approved by the SEC in

other contexts, be extended to the situation presented here?

In responding to that question, we will not address the correctness of the Court's ruling that Shearson is a co-bidder.

As this Court recognized (Opinion 45–46), a multi-service firm like Shearson that provides investment banking services to a tender offeror is subject to certain potential conflicts of interest. For example, there is a potential conflict between the firm's duty to the tender offeror to maintain the confidentiality of information concerning the tender offer and its duty, as a broker-dealer, to retail customers not to act contrary to available material information when making recommendations to them or managing their securities accounts.[1] There also are potential conflicts of interest created by the firm's duty not to take advantage of information obtained in confidence from its investment banking client, either for its customers' or its own benefit in securities transactions.

The Commission believes that violations of the federal securities laws stemming from these conflicts can be avoided through the use of well-established preven-

tive policies and procedures, such as Chinese Walls, restricted lists and watch lists. In other words, the Commission believes that neither Shearson's significant involvement in the tender offer, including its equity interest in the offeror, nor even a status as a "co-bidder" under the Williams Act, as the Court found here, makes this case different from the traditional situation in which the investment firm acts as dealer-manager without taking an equity position. Even without an equity position, the firm is subject to substantial potential conflicts of interest that are not different in principle from the conflicts that exist where it has an equity position. In both situations the firm must adopt and effectively implement appropriate preventive procedures.[2]

The Commission has rejected the view that the conflicts of interest discussed above require the prohibition of multiple roles by securities firms. The Commission has stated that, if multiple roles were prohibited, "the capital-raising capability of the industry and its ability to serve the public would be significantly weakened."[3] As stated in the 1963 Report of the Special

1. The firm, of course, may not afford its customers the benefit of confidential information relating to the tender offer, since disclosure of such information would be illegal. *See Cady, Roberts & Co.*, 40 S.E.C. 907, 916 (1961) (a broker's obligations to his customers "could not justify any actions by him contrary to law.")

2. Disclosure to Koppers' shareholders concerning Shearson's conflicts and its use of preventive devices, including the effectiveness of the devices used here, is not required by the Williams Act unless it is demonstrated that the information is material to the decisions by the Koppers' shareholders whether to tender their shares. Since the potential conflicts can be resolved through the use of appropriate procedures, there would not ordinarily be any need to disclose the information in the tender offer materials. However, disclosure of Shearson's procedures and the impact of any deficiency in those procedures would be necessary here if an alleged failure by Shearson to follow proper procedures results in contingent liabilities that would have a material effect on Shearson's ability to provide or obtain financing for the tender offer (see Item 4 of Schedule 14D-1, requiring disclosure of information relating to financing of the tender offer). Such disclosure would be required irrespective of whether, as the Court found, Shearson is a co-bidder or a financing

source, or is playing some combination of these roles. In addition, we understand that Shearson, in response to the Court's order enjoining the tender offer, has filed proposed corrective disclosures to be made in the tender offer materials. Those disclosures include Shearson's summary financial statements. If Shearson's contingent liabilities resulting from any deficiency in its procedures would have a material effect on those statements, then those liabilities must be disclosed (see Item 9 of Schedule 14D-1).

If there should be a dispute concerning Shearson's procedures as it bears on the financing of the offer or Shearson's financial condition, we believe that it is not necessary to resolve that dispute in this case, so long as the tender offer materials disclose the existence of the dispute and the impact of any contingent liabilities on Shearson's ability to provide or obtain financing for the tender offer and on its financial condition. *See* Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* at paras. 9–10. As a result, we believe that the tender offer should not be further delayed by the taking of additional discovery relating to the conflicts question.

3. Securities and Exchange Commission, *Statement of the Future Structure of the Securities*

Study of the Securities Markets, the total elimination of potential conflicts in the securities industry "is obviously quite out of the question."[4] The Commission believes that there is no need to impose a requirement as drastic as prohibition of multiple roles in these situations if preventive procedures are established and implemented.

Among the preventive procedures commonly used are Chinese Walls, restricted lists and watch lists.[5] A Chinese Wall isolates the trading side of the firm from the investment banking side. A restricted list prohibits recommendations to customers relating to, or solicitation of customer orders to purchase or sell, a particular security, and prohibits trading for the firm's own account in the security. Another type of restricted list enables the firm to prevent such activities as the issuance of a research recommendation concerning a security. Firms frequently use a watch list to monitor trading activity to determine whether any leaks in the Chinese Wall have occurred. The Commission has not designated the specific policies and procedures that should be adopted in particular circumstances.[6]

The Commission formalized the propriety of these procedures as a device to avoid liability in the context of tender offers when it adopted Rule 14e-3 in 1980. That rule establishes a "disclose or abstain from trading" requirement for persons in possession of material information regarding a tender offer, when that person "knows or has reason to know" that the information is nonpublic and has been acquired from certain specified sources. Securities Exchange Act Rule 14e-3(a), 17 C.F.R. 240.-14e-3(a). However, recognizing that a blanket proscription would prevent multiservice financial institutions from engaging in their various roles, the Commission built into the rule an exception. Under that exception, no violation of Rule 14e-3(a) occurs if an institution engaged in the securities business can show, first, that the individuals making investment decisions for a transaction about which the institution possesses confidential information did not know the information and, second, that the institution has implemented reasonable procedures to ensure that such individuals would not violate Rule 14e-3(a). These procedures may include, but are not limited to:

> (i) those which restrict any purchase, sale and causing any purchase and sale of any such security or (ii) those which prevent such individual(s) from knowing such information.

17 C.F.R. 240.14e-3(b)(2).

Although the Commission has not codified the use of preventive procedures as a means to avoid securities law liability except in Rule 14e-3, the principles also extend to actions under Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder. The Commission has made clear that position in recent testimony before Congress on proposed insider trading legislation and did so previously in connection with the Insider Trading Sanctions Act

*Markets,* Fed.Sec.L.Rep. (CCH—Special Studies) para. 74,811 at 65,623 (Feb. 2, 1972).

**4.** Report of the Special Study of Securities Markets of the Securities and Exchange Commission, 88th Cong., 1st Sess. Part I 438–440 (1963).

**5.** *See generally* Securities Act Release No. 6239 (Sept. 4, 1980), 20 SEC Docket 1241, 1252, also found at 45 Fed.Reg. 60,410 (Sept. 12, 1980). Earlier general Commission references to Chinese Walls and other procedures are found in *Report of the Special Study of Securities Markets of the Securities and Exchange Commission,* 88th Cong., 1st Sess. Part I (1963); 5 *Institutional Investor Study Report of the Securities and Exchange Commission* (1971); *Statement of the Securities and Exchange Commission on the Fu-*

*ture Structure of the Securities Markets* (1972); *Report on Bank Securities Activities of the Securities and Exchange Commission,* 95th Cong., 1st Sess. (Comm. Print 1977).

**6.** We note that, just as a firm like Shearson must employ effective preventive procedures to avoid liability arising from conflicts of interest, a firm must also comply with applicable Commission rules triggered during a tender offer. *See, e.g.,* Rule 10b-6, 17 C.F.R. 240.10b-6 (relating to trading by persons interested in a distribution); Rule 10b-13, 17 C.F.R. 240.10b-13 (relating to purchases during a tender offer or exchange offer).

of 1984. *See* Statement of David S. Ruder, Chairman, Securities and Exchange Commission, Before the Subcommittee on Securities of the Senate Banking, Housing and Urban Affairs Committee, Concerning the Commission's Revised Proposal to Define Insider Trading (Dec. 15, 1987); Letter from Chairman John S.R. Shad to Honorable Timothy E. Wirth (June 29, 1983), *reprinted in* H.R.Rep. No. 355, 98th Cong., 2d Sess. 28 (1983).[7]

The fact that Shearson has a significant involvement in this tender offer, including a substantial equity position, does not affect the availability of the Chinese Wall and other procedures as means to avoid certain securities law liability. Thus, the Commission believes that Shearson's role in the tender offer does not create any conflicts of interest that cannot be remedied through the effective implementation of the types of policies and procedures described above.

Respectfully yours,
/s/ Daniel L. Goelzer
Daniel L. Goelzer
General Counsel

cc: All parties of record (through Judge Cohill)

---

**7.** The legislative history of the Insider Trading Sanctions Act confirms the appropriateness of the Commission's approach to these conflicts questions:

The [House] Committee * * * believes that there should be certain limits on the liability of a multiservice firm, such as a broker-dealer or insurance company, where one employee possesses information but another employee, not knowing of the information, trades for the firm's account before the information is made public. Under both existing law and the bill, such a firm with an effective "Chinese Wall" would not be liable for trades effected on one side of the wall, notwithstanding inside information possessed by firm employees on the other side.

*Insider Trading Sanctions Act of 1984,* H.R.Rep. No. 355, 98th Cong., 2d Sess. 11 (1984), *reprinted in* 1984 U.S. Code Cong. & Ad. News 2274, 2284.